UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| CLIMATE CONTROL MECHANICAL SERVICES, INC., | ) | Case No. 3:15-bk-02248-JAF |
| | ) | |
| Debtor. | ) | |

**COMMUNITY BANK'S MOTION TO CONVERT CASE TO CHAPTER 7**

Secured creditor Community Bank & Trust of Florida ("Community Bank" or the "Bank") moves the Court pursuant to 11 U.S.C. § 1112(b)(1) to convert this case to a case under Chapter 7 of the Bankruptcy Code.[1]

## I. Summary of Argument.

### A. There is a substantial and continuing loss and diminution to the Debtors' estates, and there is no reasonable likelihood of the Debtors' rehabilitation in Chapter 11.

The Debtors have been operating at a loss both prepetition and post-petition. The Debtors' pending construction contracts, even if completed, would not result in any net profits to the Debtors' estates. Nor do the Debtors have sufficient unencumbered assets to obtain post-petition financing. The Debtors' initial strategy for reorganizing was contingent upon unidentified "investors" and additional contracts which never materialized.

Now the Debtors profess to be formulating a "Chapter 11 liquidation plan." Either way, if the Debtors are allowed to continue in Chapter 11, they will exhaust all of Community Bank's

[1] This motion is being filed in the cases of three affiliated debtors, Climate Control Mechanical Services, Inc. (Case No. 3:15-bk-02248-JAF) ("Climate Control"), Base 3, LLC (Case No. 3:15-bk-02249-JAF) ("Base 3") and The Alexander Group, LLC (Case No. 3:15-bk-02250-JAF) ("TAG") (collectively, the "Debtors").

remaining cash collateral and the remaining unencumbered assets of the estates, if any. As a result, the Debtors will be left with administratively insolvent cases within three months or less.

**B. These Chapter 11 cases were filed and are being prosecuted in the absence of good faith and to the prejudice of the creditors of these estates.**

These cases should have been Chapter 7 filings from the outset. They were filed as Chapter 11 cases as a collusive effort by the owner, Louie Wise, and the Sureties to benefit themselves at the expense of the other creditors in these cases. Specifically, these Chapter 11 cases were filed for the purpose of using the Debtors' assets, resources and personnel to complete unprofitable bonded contracts for the sole purpose of reducing the Sureties' exposure on their bonds and the personal liability of Mr. Wise and his wife on the bond obligations—all at the expense of the creditors of the otherwise defunct companies—resulting in no benefit to the estates.

In addition, these cases were filed as Chapter 11 cases, instead of Chapter 7, for the purpose of attempting to protect Mr. Wise from his personal liability for the Debtors' failure to pay IRS FICA taxes in excess of $345,000.

Most importantly, a Chapter 7 Trustee must be appointed as soon as possible because significant lien and bond claims belonging to the estates are not being instituted or prosecuted by the Debtors and critical claim deadline periods will soon expire. Indeed, the Debtors do not appear to have the resources or the incentive to pursue such litigation.

Finally, a Chapter 7 Trustee is also needed to investigate and prosecute avoidance actions as to prepetition transactions between and among the Debtors, insiders, affiliates and the Sureties.

## II. **Background**.

The Debtors were engaged in commercial construction. TAG was a general contractor, Base 3 was an electrical contractor and Climate Control was a mechanical contractor and HVAC service provider.

All three Debtors are wholly owned and controlled by a single individual, Louie F. Wise III ("Wise").[2] The Debtors pay purported "management fees" and other monies to non-debtor affiliates also owned by Wise, including Facility Performance, LLC ("Facility Performance"). These payments include compensation to Wise and "rent" to a non-debtor affiliate also owned by Wise.[3] The costs and fees exceed $75,000 per month in addition to the Debtors' other expenses.

For working capital, the Debtors maintained lines of credit from Community Bank since 2008. Community Bank's loans to the Debtors are secured by personal property, including all of the Debtors' receivables. The Debtors currently owe Community Bank in excess of $1,882,775. Wise guaranteed each of these loans.

| Note | Borrower | Loan Amount | Principal Amount Due | Guarantors | Collateral |
|---|---|---|---|---|---|
| 1 | Climate Control | $1 million | $957,348.32 | The Alexander Group<br>Base 3<br>Facility Performance<br>Louie Wise | All Accounts (Climate Control) |
| 2 | Climate Control | $300,000 | $300,000.00 | The Alexander Group<br>Base 3, LLC<br>Facility Performance<br>Louie Wise | Climate Control's Vehicles (9 vehicles)<br><br>Base 3's Vehicles (2 vehicles)<br><br>All Accounts (of all 3 companies)<br><br>All Equipment (of all 3 companies) |

---

[2] Amended Case Management Summary, ECF Nos. 27 (Case No. 3:15-bk-02248-JAF), 23 (Case No. 3:15-bk-02249-JAF) and 22 (Case No. 3:15-bk-02250-JAF).

[3] Amended Motion for Authority to Pay Affiliate, ECF Nos. 22 (Case No. 3:15-bk-02248-JAF), 18 (Case No. 3:15-bk-02249-JAF) and 18 (Case No. 3:15-bk-02250-JAF).

| Note | Borrower | Loan Amount | Principal Amount Due | Guarantors | Collateral |
|---|---|---|---|---|---|
| 3 | Climate Control | $ 53,300 | $ 38,431.24 | The Alexander Group<br>Base 3, LLC<br>Facility Performance<br>Louie Wise | Equipment & Software (Climate Control) |
| 4 | Base 3, LLC | $150,000 | $120,000.00 | Climate Control<br>The Alexander Group<br>Facility Performance<br>Louie Wise | All Accounts and General Intangibles (Base 3) |
| 5 | The Alexander Group | $450,000 | $450,000.00 | Climate Control<br>Base 3<br>Facility Performance<br>Louie Wise | All Equipment (of all 3 companies)<br><br>All Accounts (of all 3 companies) |

A significant number of the Debtors' contracts required payment and performance bonds. Zurich American Insurance Company and Fidelity and Deposit Company of Maryland (collectively, the "Sureties") issued bonds for those projects. Wise and his spouse agreed to indemnify the Sureties for all monies paid by the Sureties under the bonds.[4]

In early 2015, and without informing the Bank, the Debtors contacted the Sureties and admitted that they were financially unable to complete the performance of their contracts. The Debtors and the Sureties entered into an agreement by which the Sureties agreed to supplement the costs of the Debtors as minimally necessary to complete the bonded contracts—which had no profit for the Debtors—because expending the Debtors' resources and assets was the cheapest way for the Sureties to meet their liabilities under their bonds.

As a result of this covert agreement between the Sureties and the Debtors, the Debtors unlawfully removed and diverted the collateral securing the Bank's loans to the Debtors and the Sureties, including all of the Debtors' cash deposits at the Bank and their account receivables.

In April 2015, after the Bank learned of the removal of cash deposits in violation of the loan documents, the Sureties and the Debtors engaged in a series of joint efforts intended to force

[4] Sureties' emergency motion to lift stay, ECF Nos. 10 (Case No. 3:15-bk-02248-JAF), 8 (Case No. 3:15-bk-02249-JAF) and 10 (Case No. 3:15-bk-02250-JAF).

the Bank to acquiesce to financial pressure and demands that the Bank release or abandon its rights as a secured creditor. Specifically, the Debtors and the Sureties presented Community Bank with an intercreditor agreement which purported to give effect to the Sureties' claims of superior interests in receivables from the Debtors' bonded projects. Despite numerous requests, however, the Debtors and the Sureties refused to provide Community Bank with information with which to evaluate the Sureties' assertions, such as the amounts outstanding under the contracts and the amounts paid by the Sureties in connection with each contract. When Community Bank attempted to negotiate a forbearance agreement with the Debtors, the Debtors rejected it because it did not provide, as a condition precedent, that all of the terms of the forbearance agreement were conditioned upon approval by the Sureties.

On April 13, 2015, Community Bank served default notices on the Debtors and exercised its right to setoff against less than $30,000 remaining in the Debtors' bank accounts after the Debtors transferred their deposits in violation of their loan agreements with Community Bank.

In order to protect its cash collateral, Community Bank demanded that the Debtors cease using its cash collateral and issued collection letters to the Debtors' customers. In response, the Debtors filed these cases with the approval and assistance of the Sureties.[2]

Less than two days after the Petition Date, the Sureties filed a 46 page "emergency" motion in each of the Debtors' cases seeking an adjudication of its alleged priority in the Debtors' bonded receivables. In their motions, the Sureties acknowledged that the purpose of these cases is to hold Community Bank at bay while the Debtors complete bonded projects for the benefit of the Sureties:

> Based upon the Debtors' representations that the Debtors are able and willing to complete the Bonded Projects with certain relief from the Bank's actions in this Chapter 11, [the Sureties] seek[]

> relief that protects the Bonded Contract Funds, while also allowing the Debtors to complete the Bonded Projects.

In summary, these coordinated joint efforts resulted in (i) the filing of these Chapter 11 cases, (ii) the Debtors' emergency motions to use cash collateral and (iii) the Sureties' emergency motions for relief from stay to obtain a declaratory judgment from the Court as to the Sureties' purported lien priority in the Debtors' bonded receivables. [5]

## III. <u>The Debtors' Chapter 11 Cases</u>.

When the Debtors filed their petitions on May 18, 2015 (the "Petition Date"), they had (i) failed to remit payroll taxes totaling $414,000, resulting in priority IRS claims, (ii) failed to pay for workers compensation insurance in the amount of $73,954, and (iii) owed past-due premiums for their employees' health insurance totaling $53,400.[6] The Debtors' only tangible assets consisted of inventory and equipment with a stated combined value of merely $273,832.[2] Debtors' only other material assets were contract receivables.

As of the Petition Date, the Debtors only had $10,000 in cash collectively.[2] The Debtors did not even have sufficient funds to pay their payroll the following week, necessitating the filing of an emergency motion to approve a $62,000 DIP loan from the Sureties and the extension of a superpriority administrative expense claim and a superpriority lien on post-petition receivables to the DIP lender.[7] The DIP financing was limited only to the payment of the Debtors' May 29th

---

[5] The Sureties' assert that, as of the Petition Date, they had paid $1,684,839 in claims under the bonds and had received an additional $995,000 in claims.[4] The Sureties further assert that, to the extent they receive additional claims in connection with the Debtors' bonded projects, they have subrogation rights in the receivables generated by such projects superior to the rights of the Debtors and Community Bank.

[6] Motion to use cash collateral, ECF Nos. 6 (Case No. 3:15-bk-02248-JAF), 5 (Case No. 3:15-bk-02249-JAF) and 5 (Case No. 3:15-bk-02250-JAF).

[7] Emergency motion to obtain interim post-petition financing, ECF Nos. 22 (Case No. 3:15-bk-02248-JAF), 20 (Case No. 3:15-bk-02249-JAF) and 19 (Case No. 3:15-bk-02250-JAF).

payroll. It did not provide the Debtors with funds for ongoing operations or to pay other critical expenses, such as the Debtors' past-due insurance premiums.

Although the Debtors obtained leave to use cash collateral to pay their expenses on an interim basis, including their past-due workers compensation and health insurance premiums, it does not appear that the Debtors are generating sufficient income to do so. Rather, according to the Debtors' own projections, Climate Control will maintain a negative cash flow position for the next five months and Base 3 and TAG will manage only marginally positive cash flows for the foreseeable future.[6]

Specifically, in their emergency motions to use cash collateral, the Debtors projected that Climate Control would generate $609,000 in income in June 2015, presumably from collecting accounts receivable—all of which are subject to Community Bank's liens and some of which may be subject to the liens asserted by the Sureties. Climate Control's June 2015 expenses, however—without any adequate protection payments or debt service to Community Bank—will total $666,945, resulting in a $57,945 negative cash flow. For July, August, September and October 2015, the Debtors project that Climate Control will use increasing amounts of income—up to $885,000 per month—all of which is presumably cash collateral, to maintain a negative cash flow position (the change in November 2015 is not explained and still does not include adequate protection or debt service to the Bank).[6]

Similarly, the Debtors projected in their emergency motions to use cash collateral that Base 3 would use $125,000 per month to generate cash flows of $3,750 per month and TAG would use $208,300 per month to generate $4,160 per month—optimistically assuming that all goes as planned and without making any adequate protection payments or debt service to Community Bank.[6] Although Community Bank agreed to the Debtors' use of cash collateral on

an interim basis through June 22, 2015, it will not agree to the continued use of its cash collateral in this manner.

Even if, however, the Debtors obtained authority to continue operating with Community Bank's cash collateral over its objection, it does not appear that the completion of the Debtors' pending projects would result in any net profits to the Debtors' estates. In fact, the Sureties project that the net losses on the Debtors' pending bonded projects will exceed $1,500,000.

Specifically, the Sureties project the cost to complete the Debtors' pending bonded projects will be at least $1,900,000.[4] This is in addition to the $1,684,839 in claims paid and $995,000 in claims pending under the bonds as of the Petition Date, so that the Sureties' total claims will exceed $4,500,000. Based upon their examination of the Debtors' books and records, the Sureties project that the receivables from the Debtors' bonded projects will total only $2,992,037.[4] The Sureties' projections are optimistic, however, because the Debtors' schedules evidence only $1,381,005 in bonded contract receivables. Moreover, even though the Sureties were granted preliminary stay relief by this Court to collect the Debtors' bonded receivables on an interim basis, the Sureties filed reports in this Court on June 9, 2015, certifying that *no* bonded receivables had been collected since the Petition Date.[8]

Similarly, current receivables projected by the Debtors' non-bonded projects exceed current payables on those projects—without considering any additional expenses required to complete the projects—by only $331,874.[9] Due to the expenses required to complete the projects, such as labor, materials and overhead—the types of expenses for which the Debtors are

[8] ECF Nos. 48 (Case No. 3:15-bk-02248-JAF), 47 (Case No. 3:15-bk-02249-JAF) and 46 (Case No. 3:15-bk-02250-JAF).

[9] See summary of accounts receivable and accounts payable for bonded and non-bonded projects provided by Debtors pursuant to interim cash collateral order, a copy of which is attached as Exhibit A.

collectively spending more than $1,000,000 in cash collateral per month—the completion of these projects will yield no benefit to the estates. Moreover, many of these receivables are disputed—including a receivable in the amount of $2,716,721 which is at risk for being time-barred under applicable law unless litigation is commenced as soon as possible.

As a result of these dire circumstances, the Debtors have now filed omnibus motions to reject over 18 executory contracts at this early stage of the case.[10] Moreover, the Debtors acknowledged the impossibility of reorganizing under these circumstances in a meeting held with Community Bank pursuant to the Interim Cash Collateral Order on June 4, 2015. In that meeting, the Debtors admitted that they:

(1) are currently operating at a loss;

(2) have no identifiable prospective customers or future business;

(3) would have no profit from any of their bonded projects even if completed;

(4) would have a $3 million net debt to the Sureties even if the bonded contracts were completed; and

(5) could not identify any persons who might provide new capital to the Debtors.

## IV. <u>Memorandum of Law</u>.

Pursuant to 11 U.S.C. § 1112(b)(1), the bankruptcy court shall, upon a showing of "cause," dismiss, convert or appoint a trustee, whichever is in the best interests of creditors and the estate. While Section 1112(b)(4) lists examples of "cause," this list is not exhaustive. *In re Albany Partners, Ltd.*, 749 F.2d 670, 674 (11th Cir. 1984). Rather, in determining whether cause exists under Section 1112(b)(1), the court has wide discretion to consider other factors and equitable considerations in order to reach an appropriate result based upon the circumstances of

[10] ECF Nos. 50 (Case No. 3:15-bk-02248-JAF), 42 (Case No. 3:15-bk-02249-JAF) and 40 (Case No. 3:15-bk-02250-JAF).

the case. *See Id.; In re FRGR Managing Member, LLC*, 419 B.R. 576, 580 (Bankr. S.D. N.Y. 2009); *In re Schriock Const. Inc.*, 167 B.R. 569, 575 (Bankr. D. N.D. 1994).

**A. In these cases, there is substantial or continuing loss to the estates and no reasonable likelihood of rehabilitation.**

Pursuant to 11 U.S.C. § 1112(b)(4)(A), "cause" includes "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." The purpose of this provision is "to prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation." *In re The AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003).

1. If the Debtors are permitted to continue in Chapter 11, there will be a substantial and continuing loss to and diminution of their estates.

A substantial or "continuing loss to or diminution of the estate" is established where, following the petition date, the debtor has incurred continuing losses or maintained a negative cash flow position. *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 515-16 (8th Cir. 2004); *Schriock*, 167 B.R. at 575. In these cases, the Debtors' projections show that, even while consuming between $600,000 to $885,000 of cash collateral per month and without paying Community Bank adequate protection or debt service, Climate Control will maintain a negative cash flow position for at least the next five months. Similarly, Base 3 and TAG, while together spending more than $330,000 in cash collateral per month and without paying Community Bank adequate protection or debt service, will—if all goes as originally planned—manage only marginally positive cash flows of $3,750 and $4,160, respectively.

Consistent with the cash flow problems apparent in the Debtors' budgets, the Debtors' projections show that the expenditure of all of this cash collateral will not

generate any net profits. The Debtors admit that, even if the Debtors' pending bonded projects were completed, they would not generate any net profits, and the Sureties project that the losses associated with these contracts would exceed $1,500,000. Similarly, according to the information provided by the Debtors, the completion of the Debtors' pending non-bonded contracts would also not result in any net profits. .

The Debtors have admitted that they are operating at a loss and have had to obtain DIP financing for routine operational expenses, generating superpriority liens and administrative expenses in the process. If these Chapter 11 cases are allowed to continue, they will quickly become administratively insolvent.

2. <u>There is no reasonable likelihood of the Debtors' rehabilitation</u>.

Under Section 1112(b)(4)(a), "rehabilitation" means the successful reestablishment of the debtor's business operations on solid financial ground, with the cash flow to meet its current obligations. *AdBrite*, 290 B.R. at 216 ("In this context, rehabilitation means to put back in good condition and reestablish on a sound basis. It signifies that the debtor will be reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met.") (citation omitted); *Loop Corp. v. U. S. Tr.*, 290 B.R. 108, 112-113 (D. Minn. 2003) ("Absence of likelihood of rehabilitation is satisfied by a showing that the debtor is unable to get the business up and running again on a firm base. Under § 1112(b), 'rehabilitation' contemplates the successful maintenance or reestablishment of the debtor's business operations") (citations omitted).

In these cases, the Debtors have neither the wherewithal nor the intention to reestablish their business operations on solid financial grounds. Rather, the Debtors have

"no more than a 'hopeless and unrealistic prospect' of rehabilitation." *See AdBrite*, 290 B.R. at 215.

First, the Debtors have admitted that they have no identifiable prospective customers or future business. The Debtors have also admitted that they have not been able to identify any persons who might provide new capital. Nor do the Debtors have any unencumbered assets which might secure post-petition financing. The Debtors thus have no viable business and no reasonable likelihood of rehabilitation in Chapter 11. *See In re 3868-70 White Plains Rd., Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983) (where the debtor had no unencumbered assets and no identifiable source of new capital or future earnings, there was no reasonable likelihood of rehabilitation).

In addition, the Debtors have already acknowledged the hopelessness of reorganizing and have asserted that they intend to formulate a plan of liquidation. This intention to liquidate rather than reorganize demonstrates that there is no likelihood of rehabilitation. *See Loop*, 379 F.3d at 516 (where the debtors intended to liquidate their assets rather than restore their business operations, they had no reasonable likelihood of rehabilitation); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 347-49 (Bankr. S.D.N.Y. 2010) (the debtors' intention to liquidate demonstrates that there is no likelihood of rehabilitation).

Where, as here, there is no realistic prospect for rehabilitation, conversion should be granted, even in the early stages of the case:

> Creditors need not wait until a debtor proposes a plan or until the debtor's exclusive right to file a plan has expired .... The very purpose of § 1112(b) is to cut short this plan and confirmation process where it is pointless.
>
> *Loop*, 379 F.3d at 519.

Creditors should not be subjected to the expense and delay of the Chapter 11 process where reorganization is futile. Conversion of the cases would prevent the needless and wasteful escalation of administrative expenses. Given the continuing losses to the estates and the absence of a reasonable likelihood of reorganization, these cases should be converted at this time.

### B. Alternatively, the Debtors are not operating with the good faith required of a Chapter 11 debtor.

Good faith is an implicit requirement for filing a Chapter 11 petition. *In re Boughton,* 243 B.R. 830, 834 (Bankr. M.D. Fla. 2000). A debtor's lack of good faith therefore constitutes cause to dismiss or convert a case under Section 1112(b)(1). *See The Bal Harbour Club, Inc. v. AVA Dev., Inc. (In re The Bal Harbour Club, Inc.),* 316 F.3d 1192, 1193-94 (11th Cir. 2003); *Boughton,* 243 B.R. at 834.

In determining whether a debtor lacks good faith, the court should consider facts which evidence an intent to abuse the judicial process and the purposes of the reorganization provisions. *Albany Partners,* 749 F.2d at 674. Conversion based upon lack of good faith is particularly appropriate where there is no realistic possibility of reorganization and it is evident that the petition was filed to delay or frustrate secured creditors' legitimate efforts to enforce their rights. *See id.*

As set forth above, these cases were filed not only with no realistic hope of reorganization but with no intention to reorganize. Rather, the conduct of the Debtors and the Sureties demonstrates that these cases were filed for the benefit of the Sureties and of Wise.

When the Debtors' precarious financial condition threatened to trigger the Sureties' obligations under the bonds and, in turn, Wise's obligations to the Sureties, the Debtors and the Sureties entered into a collusive agreement to limit the exposure of the Sureties and Wise. The

key to their strategy was to keep the Debtors working on their bonded contracts. To maximize the cash available to complete the Debtors' bonded projects and, at the Sureties' behest, the Debtors transferred funds out of their Community Bank accounts in violation of their loan agreements with the Bank. For a short time, the Sureties advanced funds to the Debtors so that they could continue working on the bonded projects. But when Community Bank declared defaults under its loans and began efforts to enforce its rights in its cash collateral, the Debtors filed these cases.

Less than two days after the cases were filed, the Sureties filed extensive "emergency" motions for relief from stay. As the Sureties admitted in their motions, these cases were a joint effort by the Debtors and the Sureties to stay Community Bank's legitimate collection efforts so that the Debtors can use cash collateral to complete bonded projects:

> Based upon the Debtors' representations that the Debtors are able and willing to complete the Bonded Projects with certain relief from the Bank's actions in this Chapter 11, [the Sureties] seek[] relief that protects the Bonded Contract Funds, while also allowing the Debtors to complete the Bonded Projects.

This strategy was and is totally devoid of any effort or intention to fulfill the duties of a debtor in possession to maximize the estate for the benefit of all creditors. Lacking the good faith required of a Chapter 11 debtor, the Debtors should not be permitted to continue manipulating the Chapter 11 process and wasting the few assets that might otherwise be available for the Bank and unsecured creditors.

### C. Conversion of the Debtors' cases to Chapter 7 would be in the best interests of creditors.

Upon a showing of cause, the court must determine whether dismissal or conversion to Chapter 7 is in the best interests of creditors and the estate. *FRGR*, 419 B.R. at 580. In these

cases, conversion to Chapter 7 would be in the best interests of the creditors and the estates.

A Chapter 7 trustee is needed to diligently pursue the Debtors' accounts receivable, including the filing of claims prior to looming deadlines. Given the prepetition conduct of the parties and the payments between affiliates and the Sureties, a Chapter 7 trustee is also needed to investigate whether there are any potential claims against Wise, other affiliates such as Facility Performance, the Sureties and others. *See id.* at 582 (where the case "cries out for an independent fiduciary to examine the transactions" between the debtor, its principals and a creditor, the case should be converted).

## V. **Conclusion.**

Based upon the foregoing, Community Bank respectfully requests the Court enter orders converting the Debtors' cases to Chapter 7, and granting such further relief as is just and proper.

SMITH HULSEY & BUSEY

By: *s/ James H. Post*

James H. Post
Leanne McKnight Prendergast

Florida Bar Number 175460
Florida Bar Number 59544
225 Water Street, Suite 1800
Jacksonville, Florida 32202
(904) 359-7700
(904) 359-7708 (facsimile)
jpost@smithhulsey.com
lprendergast@smithhulsey.com

Counsel for Community Bank & Trust of Florida

# EXHIBIT A

| | Non-Bonded | Bonded | Total |
|---|---|---|---|
| **TAG** | | | |
| AR | 31,160.96 | 590,897.34 | 622,058.30 |
| AP | 621,204.79 | 433,402.19 | 1,054,606.98 |
| Difference | (590,043.83) | 157,495.15 | (432,548.68) |
| | | | |
| **Base** | | | |
| AR | 58,007.85 | 437,709.73 | 495,717.58 |
| AP | 67,627.70 | 331,377.09 | 399,004.79 |
| Difference | (9,619.85) | 106,332.64 | 96,712.79 |
| | | | |
| **CCMS** | | | |
| AR | 3,192,424.86 | 352,392.27 | 3,544,817.13 |
| AP | 2,260,887.56 | 573,583.35 | 2,834,470.91 |
| Difference | 931,537.30 | (221,191.08) | 710,346.22 |
| | | | |
| **Total** | | | |
| AR | 3,281,593.67 | 1,380,999.34 | 4,662,593.01 |
| **CCMS >90** | 2,656,280.94 | | |
| AR less CCMS>90 | 625,312.73 | 1,380,999.34 | 4,662,593.01 |
| AP | 2,949,720.05 | 1,338,362.63 | 4,288,082.68 |
| Difference | (2,324,407.32) | 42,636.71 | 374,510.33 |

**Certificate of Service**

I certify that a copy of the foregoing was furnished by cm/ecf electronic notification to Richard A. Perry, Esq., 820 East Fort King Street, Ocala, Florida 34471; United States Trustee, 400 West Washington Street, Suite 1100, Orlando, Florida 32801; and to the parties entitled to receive cm/ecf notifications in this case, this 17th day of June, 2015.

/s/ *James H. Post*
Attorney