ORDERED.

Dated:  March 06, 2018

_____
Jerry A. Funk
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

IN RE:

CLIMATE CONTROL MECHANICAL SERVICES, INC.,

BASE 3, LLC,
THE ALEXANDER GROUP, LLC
FACILITY PERFORMANCE, LLC

       Debtors.

Chapter 11
Case No.:  3:15-bk-2248-JAF

Jointly Administered with:
Case No.:  3:15-bk-2249-JAF
Case No.:  3:15-bk-2250-JAF
Case No.:  3:15-bk-5021-JAF

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is before the Court upon the Motion to Appoint Chapter 11 Trustee or, alternatively, Convert to Chapter 7 (Doc. 554) filed by the United States Trustee ("U.S. Trustee") and the Emergency Motion for Appointment of a Chapter 11 Trustee or, alternatively, Convert Case to Chapter 7 (Doc. 507) filed by creditor Ciraco Electric, Inc.  On January 31, 2018, the Court conducted a trial.  Following the presentation of evidence, the Court directed the parties to submit written closing argument in support of their respective positions.  Upon the evidence presented

and the memoranda of the parties (Docs. 586, 587, 588, 589), the Court makes the following

Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052.

## BACKGROUND

In May 2015, Climate Control Mechanical Services, Inc. ("Climate Control"), Base 3 LLC

("Base 3"), and The Alexander Group, LLC ("Alexander Group") each filed a petition for relief

under Chapter 11 of the Bankruptcy Code, and the three cases were consolidated for procedural

purposes.  (Doc. 114).  Facility Performance, LLC ("Facility Performance") filed a Chapter 11

petition in November 2015, and its case was procedurally consolidated with the other three cases.

(Doc. 239).  The Court authorized each Debtor to operate its respective business as a debtor-in-

possession.  (Docs. 15, 114).  Each Debtor entity is wholly owned and controlled by Louie Wise

("Wise").

In November 2017, Ciraco Electric, Inc. ("Ciraco"), a creditor of Alexander Group, filed

an Emergency Motion to Appoint Trustee or Convert Cases to Chapter 7 as well as an Emergency

Motion to Freeze Unauthorized Bank Accounts (Docs. 507, 508) (collectively the "Emergency

Motions").  In January 2018, the U.S. Trustee filed a similar motion, seeking to appoint a Chapter

11 trustee or, in the alternative, to convert to Chapter 7 (the "U.S. Trustee's Motion").  (Doc. 554).

The U.S. Trustee's Motion asserted arguments for both appointment of a trustee and conversion

to Chapter 7, but focuses on appointment.  (Docs. 554 at 13, 586 at 7).

Prior to trial, the Debtors consented to having their unauthorized "non-debtor-in-

possession" financial accounts frozen.  The Court ordered the Debtors and Wise to close all

unauthorized accounts, transfer any funds held in those accounts to the appropriate Debtor's

authorized account/s, and to file a statement under penalty of perjury attesting to satisfaction of

the order.  (Doc. 540).  The Debtors also consented to an order, under 11 U.S.C. § 1104(c),

directing the U.S. Trustee to appoint an examiner (the "Examiner") to undertake an investigation and financial accounting of the Debtors. (Doc. 526). The Examiner was appointed by the U.S. Trustee and approved by the Court. (Doc. 536). The Examiner filed his preliminary report on December 29, 2017. (Doc. 545). Ultimately, on January 31, 2018, a trial was held on the U.S. Trustee's Motion and the outstanding portions of Ciraco's Emergency Motions. (Doc. 577).

The crux of the U.S. Trustee's argument is that "[t]he current management of the Debtors cannot be depended upon to carry out the fiduciary responsibilities of a trustee." (Doc. 586 at 9). More specifically, the U.S. Trustee contends that Wise and the current management have "deliberately concealed estate monies in undisclosed bank accounts at unauthorized depositories; disregard[ed] the Orders of this Court and the duties of a debtor-in-possession; filed incomplete and inaccurate [monthly operating reports] under penalty of perjury; failed to account for estate monies; retained professionals without seeking Court authorization; made payments to professionals and insiders; transferred monies amongst the Debtors and a related non-debtor entity without disclosure and without Court authorization; and incurred significant post-petition administrative claims owed to taxing authorities and accounts payables." (Doc. 586 at 9-10). Ciraco asserts essentially the same arguments as the U.S. Trustee.

The Debtors oppose the appointment of a trustee but support the continued appointment of the Examiner. (Doc. 588 at 2). The Debtors contend there has been "substantial change in management and an honest attempt to remedy [the] misconduct." (Doc. 588 at 5-6). They contend "[a] new and more qualified chief financial officer was hired; misplaced funds were returned; and bookkeeping and record keeping have been implemented." (Doc. 588 at 5-6). The Debtors detail the remedial steps taken by the new management as support for their argument. Creditor Community Bank & Trust of Florida ("Community Bank") supports the argument of the Debtors

and opposes the appointment of a Chapter 11 trustee. Community Bank specifically contends that appointment of a Chapter 11 trustee is not in the best interests of the creditors. Community Bank is the single largest creditor in dollar-amount claimed, and is a creditor of all four Debtors.

## FINDINGS OF FACT

As noted above, Climate Control, Base 3, Alexander Group, and Facility Performance are each wholly owned and controlled by Wise. Wise is the chief executive officer of each Debtor entity, all of which are involved in the construction business. Climate Control focuses on mechanical and HVAC subcontracting, Base 3 is an electrical subcontracting company, and Alexander Group operates as a general contractor. Facility Performance provides facility-management services to clients and sometimes employs/subcontracts the other Debtor entities.

### *The Debtors' two chief financial officers*

Wise hired his first chief financial officer, Ralph Pressley ("Pressley"), in January 2015. Pressley acted as the chief financial officer for each of the four Debtors. Pressley remained with the Debtors through the bankruptcy filing and up until March 2017, several months before Ciraco filed its Emergency Motions. (Doc. 582 at 118, 128, 132, 148). In March 2017, an event occurred that Wise referred to as "when my C-suite went rogue." (Doc. 582 a 132). Wise testified that, on March 28, 2017, Pressley came into work uncharacteristically early and left with the computer on his desk sometime before 8 a.m. that morning. Around 8 a.m., one of Wise's managers indicated that workers were taking materials and tools out of the back of the facility warehouse. (Doc. 582 at 148, 154). Wise locked the front gate to prevent the workers from leaving with any additional materials. The workers told Wise they were "under direction to move those things." Wise told a worker to unload the trailer full of material and tools, but the worker left through the facility's back gate and went to a different location. Before leaving, the worker explained where he was

taking the equipment.  (Doc. 582 at 154).  Wise called the police, who eventually showed up at the other location.  Wise was not present, but Pressley showed up at the location and produced "an operating report" that convinced the police not to arrest the workers.  Wise was able to recover the vehicles, but the "inventory and tools are still in a civil dispute."  (Doc. 582 at 155).  Data was also taken from the Debtors' servers, which included contracts, estimates, estimating spreadsheets, and other digital material used in Debtors' operations.  Wise testified that he intends to pursue the action regarding the inventory and tools.  Wise summed-up this event by saying, "So everything went weird on March 28th."  (Doc. 582 at 155).

As a result of the events of March 28, 2017, Wise replaced Pressley, as well as the chief operating officer (who allegedly colluded with Pressley).  Pressley was replaced by Larry Booth ("Booth") (also referred to as "Al" or "A.L."), who remains the chief financial officer.  In essence, Wise blames the financial mismanagement, the failure to respect corporate formalities, the use of unauthorized bank accounts, and the failure to comply with reporting requirements on Pressley.  No evidence was presented to contradict Wise's description or characterization of the events of March 28.  Wise and Booth have been working with the Examiner to clean and clarify the Debtors' books and to file corrected monthly operating reports.  The Debtors also provided the Examiner with all information he requested.  The Court finds that Wise and Booth intend to cooperate with the Examiner and to comply with the Debtors' fiduciary duties to the bankruptcy estates.

Wise testified that he never reviewed any monthly operating report prior to the reports being sent by Pressley to the Debtors' attorney and that he did not know the unauthorized accounts were omitted from previous monthly operating reports.  Although certain documents (including monthly operating reports) appear to contain Wise's signature, the unrefuted evidence shows that Pressley signed Wise's signature in several instances.  While Booth is no handwriting expert, he

also testified without objection that various pertinent documents purporting to contain Wise's signature were not actually Wise's signature and that he would be able to recognize Wise's signature if and when he saw it. Wise's testimony indicates that Pressley drafted the monthly operating reports, signed Wise's signature, and then emailed the reports to the Debtors' attorney while copying Wise on the email. Wise testified he did not review the reports before or after they were emailed to the Debtors' attorney. The Court observed Wise's testimony and demeanor, and finds it credible that he did not personally review the operating reports. While Wise's testimony places all the fault on Pressley, neither the U.S. Trustee nor Ciraco presented any evidence impugning Wise's credibility. The Debtors' quick consent to the freezing of unauthorized accounts and to the appointment of an Examiner tends to buttress Wise's credibility. Further, there is no evidence Wise personally deceived any party. Thus, given the movants' elevated burden of persuasion in this matter (see below), the Court cannot find that current management (i.e., Wise and Booth) had personal knowledge of the omissions and faulty bookkeeping identified by the Examiner, at the time the monthly operating reports were issued by the Debtors.

### The Examiner's findings

The Examiner filed a preliminary report, which was admitted into evidence without objection. (Doc. 582 at 25) (trial transcript); (Doc. 545) (the Examiner's report). The theme of his testimony was that, in light of his investigation, "there's a lot of unanswered questions." (Doc. 582 at 71). In determining the initial scope of his investigation, the Examiner identified several issues: a) improper disposition of funds from the undisclosed settlement of a BP-Horizon claim; b) the use of non-debtor-in-possession (or unauthorized) bank accounts; c) possible diversion of business to non-debtor entities; d) unreported use of prepaid expense cards by employees; e) possible improper or unauthorized payments to professionals; f) possible improper or unauthorized

payments to non-debtor related entities; and g) the failure to file proper monthly operating reports required by Bankruptcy Rule 2015(3) and § 704(a)(8). The Examiner personally met with Wise, Booth, and the Debtors' counsel. (Doc. 582 at 26). The Examiner spent three days at the Debtors' offices and was given all the information he requested. (Doc. 582 at 49, 72).

The Examiner found numerous technical deficiencies in the previously filed monthly operating reports, including the failure to attach bank statements and the failure to report certain receipts and disbursements. Of primary concern to the Examiner was Alexander Group's receipt of a settlement payout on a BP-Horizon claim in the amount of $67,511. (Doc. 582 at 28). The BP-Horizon claim had been filed prepetition, but neither the claim nor the post-petition receipt of funds was reported by Alexander Group. The funds were deposited into an unauthorized post-petition account at CenterState Bank. Two checks were drafted against these funds, one for $30,000 and one for $35,000, both of which were made out to cash and signed by Pressley. (Doc. 582 at 30). The account was later closed with the remaining funds withdrawn to cash. This was the only activity in the account, and the Examiner could not fully trace the funds once converted to cash. The Examiner's discussions with Wise indicated that all but $4,486[1] of the original $67,511 was returned to the estates—$18,000 was correctly returned to Alexander Group while $45,000 was incorrectly returned to Facility Performance. Corporate formalities and distinctions were not respected even after Pressley left. The Examiner testified Wise told him that $10,000 of the original $67,511 went to Pressley and Wise's testimony confirmed this, but it was never made clear why Pressley ended up with the $10,000. (Doc. 582 at 51-54, 132-33).[2]

---

[1]  A $25 account fee was paid to CenterState Bank from the original $67,511.

[2]  Ciraco's written closing argument mentions that certain occurrences were not fully explained by Wise. However, the Court cannot make findings based on Wise's failure to answer questions he was not asked. The result in this matter is driven chiefly by a failure to prove the necessary facts coupled with an over-reliance on innuendo and inference rather than direct evidence.

That notwithstanding, Wise testified he "parked" $45,000 of the original amount with an old college friend (Doc. 582 at 133), which represents the portion returned to Facility Performance. The Examiner did not refute that the money was returned, but was unsure whether the returned funds were the same settlement funds that were liquidated into cash. There was no evidence showing the returned funds originated from a source *other than* the original BP-Horizon settlement funds. Indeed, the Examiner testified there was only "a possibility" the returned funds were taken from elsewhere. (Doc. 582 at 55-56). In the absence of evidence to the contrary, the Court finds that all, except for $4,486, of the BP-Horizon settlement money was returned to Alexander Group and Facility Performance. Wise repaid slightly over half of the $10,000 that went to Pressley. It is quite clear, however, that the settlement funds were not properly disclosed and the $45,000 portion should have gone to Alexander Group rather than Facility Performance.

As to the improper diversion of funds, an unrelated company named Skanska USA Building, Inc. ("Skanska") had procured the prime contract to build a chemistry building for the University of Florida. Skanska subcontracted the HVAC work to Climate Control. The University of Florida elected to do a "direct buy" of materials and pay materialmen directly. Climate Control subcontracted with an entity named Native HUBZone as the materialman for Climate Control's subcontract work. Native HUBZone is a related non-debtor entity that is wholly owned by Wise.

Native HUBZone then sub-subcontracted with an unrelated third-party entity named Commercial Ductwork Systems to fabricate the materials. Native HUBZone netted roughly $53,000 in profit between its cost paid to Commercial Ductwork Systems and the revenue received from the University of Florida, for providing the materials. Native HUBZone had no employees but operated out of the same address as the Debtor entities. Native HUBZone disbursed money directly to Wise and Pressley, but to no other employees. The implication is that this $53,000 net

profit was improperly redirected to a non-debtor entity for the benefit of Wise and Pressley and to the detriment of Climate Control's creditors.

However, Wise testified the purpose for using Native HUBZone was to help ensure "getting that project."   Climate Control submitted a prequalification statement to Skanska indicating that Climate Control "could help with diversity, minority and other smaller vendor selection."[3]  (Doc. 582 at 125).  As a result, "[t]he [Commercial Ductwork] piece [was] rolled up underneath Native HUBZone because it helped us with the prequalification statement [Climate Control] had submitted to Skanska."   (Doc. 582 at 126).   This transaction between Native HUBZone and Commercial Ductwork Systems occurred prior to Booth coming on board.   The Court cannot find the movants met their elevated burden of persuasion in showing Wise improperly misdirected funds to Native HUBZone.

As to the prepaid expense cards, Climate Control opened a post-petition unauthorized account at CenterState Bank in order to provide its workers with expense cards to pay for fuel while operating afield.  The account was not disclosed.  The account was periodically replenished with funds from other authorized accounts and from business receipts from Climate Control's customers.  Deposits into and expenditures made by Climate Control's workers were reported as generalized aggregated vehicle expenses rather than individual expenditures.  The Examiner could not verify that all expense-card expenditures were for business purposes.  (Doc. 582 at 38-39).

The individual expense-card transactions, made by Climate Control's workers, were not separately reported.  This caused monthly expenditures to be overstated by the amount of unused funds remaining in the prepaid-expense-card account each month, which led to inaccurate monthly

---

[3]   See also Office of the HUBZone Program, https://www.sba.gov/offices/headquarters/ohp ("The Office of the HUBZone Program's mission is to promote job growth, capital investment, and economic development to historically underutilized business zones, referred to as HUBZones, by providing contracting assistance to small businesses located in these economically distressed communities.").

operating reports.  The Court finds movants failed to meet their burden of persuasion in demonstrating any fraudulent acts or other gross mismanagement occurred in relation to the prepaid expense cards.  Nevertheless, going forward, Climate Control must properly record and report these accounts.

The Examiner found a series of journal entries wherein a check draft was written by Native HUBZone to Climate Control on February 3, 2017, in the amount of $105,936.  (Doc. 582 at 44).  Three weeks later, on February 24, Climate Control drafted a check for that exact amount to be paid back to Native HUBZone.  This February 24 check was not deposited by Native HUBZone until April 24, 2017.  The Examiner did not "have any idea why that was done."  (Doc. 582 at 44).  The Examiner did not indicate that any funds were missing as a result of this transaction.  Again, this was before Booth came on board.

The Examiner testified that, in November 2015, Facility Performance received $58,638.60 (after a $15 wire transfer fee was deducted) with the transfer remitter notated as "Home & Note Document."  Wise told the Examiner this was a loan he made to Facility Performance.  This loan was not disclosed or authorized by the Court.  (Doc. 582 at 60).  The following month, a disbursement of $58,653.60 (with the $15 added back in) was made by Facility Performance to Wise to repay the loan, and the repayment was recorded as such in Facility Performance's general ledger.  The Examiner could not verify or disprove that the original source of the funds was Wise.  The Examiner testified that no note or loan agreement was produced but that he did not ask Wise for such a document.  This does not constitute evidence of fraud or mismanagement, even though the loan was not authorized by the Court as it should have been.

In June 2016, Native HUBZone received $194,508 from an unrelated company named VetCon Services.  (Doc. 582 at 63); (Doc. 545 at 19).  The memo field on the check deposit stated

"Signature Brands," which is a customer of Facility Performance.  The Examiner's concern was that Wise and Pressley may have improperly received funds from Native HUBZone that should have gone to Facility Performance's estate.  (Doc. 582 at 64).  The Examiner's ultimate conclusion was that "there's a question about whether . . . these transactions should not have been recorded within the bankruptcy estate."  (Doc. 582 at 64-65).  This is, perhaps, the closest evidence of the misdirection of funds.  However, the Examiner's conclusion that questions remain is not sufficient for the Court to find there was an intentional misdirection of funds by Facility Performance's current management.  This activity occurred during Pressley's tenure, and all the evidence indicates the problems introduced by Pressley are being addressed.

## CONCLUSIONS OF LAW

At trial and in his motion, the U.S. Trustee focused his argument on the appointment of a Chapter 11 trustee rather than conversion.  The Court concludes that "cause" for appointment of a trustee has not been shown and that appointment is not warranted under the present circumstances. The Court concludes that conversion is likewise unwarranted for the same underlying reasons.[4] For simplicity, however, the Court focuses its analysis on appointment.

Subject to conditions prescribed by the Court, a Chapter 11 debtor traditionally serves as a "debtor in possession" with many of the rights and duties of a bankruptcy trustee.  11 U.S.C. § 1107(a) (2015).  Such duties include, among other things, the duty to "be accountable for all money received" and to file "periodic reports and summaries of the operation of such business."  11 U.S.C. § 704(a)(2) & (8) (2015); 11 U.S.C. § 1106(a)(1) (2015).  Like a trustee, a debtor in possession

---

[4] The Court finds that conversion to a liquidation case would be much more detrimental to the creditors' interests than appointment of a Chapter 11 trustee, given the present facts.  Ciraco gives little more than lip service to the idea of conversion, only perfunctorily mentioning conversion twice in its written closing arguments without offering any direct legal analysis of the issue.  (Doc. 587 at 3, 10).

may not use estate property outside of the ordinary course of business without prior court authorization following a properly noticed hearing.  11 U.S.C. § 363(b)-(c) (2015).

Section 1104(a) of the Bankruptcy Code provides the statutory mechanism by which an interested party may seek the appointment of a Chapter 11 trustee.  Section 1104(a) states:

> (a) At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee--
>
> > (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
> >
> > (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a) (2018).

"There is a strong presumption in chapter 11 cases that a debtor in possession should remain in possession absent a showing of the need for a trustee." In re Sundale, Ltd., 400 B.R. 890, 899 (Bankr. S.D. Fla. 2009).  "This presumption is based on the belief that the debtor in possession is most knowledgeable about, and best able to run, the debtor's business." Id.  "Because the appointment of a trustee is such an extraordinary remedy, the moving party must show that cause for appointment of a trustee exists by clear and convincing evidence." Id.; see also In re G-I Holdings, Inc., 385 F.3d 313, 318 (3d Cir. 2004) (holding that phrase "strong presumption" was way of referring to heavy burden of persuasion, i.e., by clear and convincing evidence, the party moving for appointment of a Chapter 11 trustee must satisfy).

"The decision whether to appoint a trustee is fact intensive and the determination must be made on a case-by-case basis." In re Breland, 570 B.R. 643, 657 (Bankr. S.D. Ala. 2017).  "While

appointment is mandatory once cause is found, it is within the court's discretion, on a case-by-case basis, to determine whether conduct rises to the level of cause." Id.  "[A]ppointment of a trustee is a power which is critical for the [C]ourt to exercise in order to preserve the integrity of the bankruptcy process and to insure that the interests of creditors are served." Id.

"Cases interpreting the scope of the provisions of Section 1104 have been ruled on by a number of appellate courts, although there is no Eleventh Circuit authority in this area." Id.  "A review of the appellate decisions reveals common threads." Id.  "The inquiry into whether 'cause' exists for such an appointment is not limited to the enumerated list of fraud, dishonesty, incompetency or gross mismanagement, but extends to 'similar cause.'" Id.

Here, the Court is not convinced that cause exists for the appointment of a trustee and concludes that movants have not persuaded the Court that "cause" exists for the appointment of a trustee (or conversion to Chapter 7).  Movants have further failed to persuade the Court that appointment of a trustee is in the creditors' interests.

Section 1104(a) applies to misconduct of the "current management."  However, the unrefuted evidence places all fault for the accounting deficiencies on Pressley, who is no longer a part of the "current management."  The new chief financial officer has demonstrated a willingness and ability to work with the Examiner to rectify the deficiencies.  Moreover, the change in chief financial officers was made seven to eight months before these issues were first raised by Ciraco.

Wise's incompetence in relying on Pressley does not rise to the level of "fraud, dishonesty, incompetence, or gross mismanagement" or other "similar cause" contemplated by § 1104(a).  See Breland, 570 B.R. at 657.  This is a case of closely held entities with a chief executive adept at operational tasks, but personally lacking the accounting skills necessary to bring the entities through the Chapter 11 process.  Such accounting tasks and related work could, perhaps, be ignored

up until Debtors filed for bankruptcy protection.  Upon filing, however, those back-office tasks morphed into fiduciary responsibilities owed to the four bankruptcy estates.

In <u>Breland</u>, Judge Oldshue provided instructional guidance to individual Chapter 11 debtors but his guidance remains pertinent to the present case.  Judge Oldshue stated, "One of the most difficult concepts an individual Chapter 11 debtor has to grasp is that once he files bankruptcy he has a fiduciary duty to his creditors to act in the best interest of the bankruptcy estate."  <u>Id.</u> at 656.  "This means [the debtor-in-possession] must generally put the interests of his creditors ahead of his own interests."  <u>Id.</u>  "To accomplish his fiduciary responsibility, he must act in a transparent, forthright, and candid manner and work to benefit the bankruptcy estate even if that may be a detriment to him individually."  <u>Id.</u>  Judge Oldshue's words apply with equal force to Wise's management of the instant Debtors.

The evidence (as well as Wise's demeanor) convinces the Court that Wise recognizes the problem and the need to rectify it.  The Debtors' agreement to the freezing of unauthorized accounts and to the appointment of an Examiner demonstrates such recognition and willingness to correct the problems.  The Examiner's testimony also demonstrates that the Debtors' current management worked with and will continue to work with the Examiner to rectify the outstanding problems.  The Examiner did not describe any unwillingness to aid his investigation.

The Court is also persuaded by Community Bank's contention that the appointment of a trustee is not in the creditors' interests.  Community Bank is the single largest creditor and is a creditor of all four Debtors.  Community Bank specifically contends its interests are better protected without a Chapter 11 trustee (Doc. 589 at 4) and, given the circumstances of this case, the Court must lend a measure of credence to this contention.  That being said, even if Community Bank desired the appointment of a trustee, movants simply have not met their burden.

14

The Court concludes the Examiner should remain until such time as the Debtors' books are fully reconciled, and all corrected monthly operating reports are filed. These corrected reports shall include an accurate schedule of receipts and disbursements, as well as a summary of bank activity for each monthly bank statement. The reports shall also attach all bank statements and account reconciliation statements, in addition to conforming to all other pertinent requirements under Title 11. If Wise or his staff fail to continue to work with the Examiner to rectify the past failures in a timely and efficient manner, the Court may reconsider its decision.

Lastly, the testimony revealed a belief that there is but one bankruptcy estate. However, there are four independent estates because these cases are not substantively consolidated. Estate boundaries, corporate boundaries, and corporate formalities must be respected and adhered-to during the pendency of these cases. Additionally, if any direct evidence is discovered showing unreturned missing funds from any estate or showing that any receipts were improperly redirected by the current management to the detriment of any creditor, the proper parties are instructed to bring such evidence to the Court's attention at once. This is the Debtors' opportunity to get back on track and bring these cases to fruition.

The Court will enter a separate order consistent with these Findings of Fact and Conclusions of Law.